NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK V. MORIN,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>20/20 COMPANIES, a corporation,<br>VERIZON COMMUNICATIONS, INC., a<br>corporation, JOSHUA MICHAEL FANELLI,<br>individually, ANTHONY OTTAVIANO,<br>individually, and DAVID BROWN,<br>individually,<br><br>　　　　　　　Defendants | Civil Action No.: 10-6476 (JLL)<br><br><br>OPINION |

**LINARES**, District Judge.

This matter comes before the Court by way of two motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The first is by Defendants 20/20 Communications ("20/20") and Michael Fanelli (collectively "20/20 Defendants") (CM/ECF No. 38). The second is a motion by Defendants Verizon Communications, Inc. ("Verizon"), David Brown, and Anthony Ottaviano (collectively "Verizon Defendants") (CM/ECF No. 37). The Court has considered the parties' written submissions in support of and in opposition to the instant motions. No oral argument was heard pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, both motions are GRANTED.

1

## I. BACKGROUND

20/20, "a company that contracts with telecommunications companies to sell those companies' services," contracts with co-Defendant Verizon to sell its "FIOS" internet, television and phone services in various regions. (20/20 Statement of Material Facts ¶¶ 1, 3) ("SUMF"). The amount of fees received by 20/20 correlates with the number of sales it secures for clients, like Verizon. (20/20 SUMF ¶ 5). Accordingly, Defendant 20/20 requires that employees sign an Employment Agreement which, in relevant part, restricts employees from directly servicing customers outside of their capacity as an employee of 20/20. (20/20 SUMF ¶ 21). Defendant 20/20 also maintained an Employee Handbook which prohibits employees from diverting business from the company or soliciting customers for another company while employed and for two years thereafter. (20/20 SUMF ¶ 22).

Defendants 20/20 and Verizon had a Marketing Agreement which provided, in relevant part, that during its term and ninety days thereafter, "Verizon shall not . . . hire an employee or agent who is either currently employed or was employed by [20/20] within ninety (90) days of being hired by Verizon." (20/20 SUMF ¶¶ 23, 28; Lee Certif. Ex C). This was due in part to the fact that Verizon used both independent agents and companies such as 20/20 for certain sales events.

Plaintiff Mark V. Morin ("Morin" or "Plaintiff") was previously employed by Defendant 20/20 and sold Verizon products during the time in question. (20/20 SUMF, ¶¶ 1, 14). Plaintiff began working for 20/20 in October 2007 based in Albany, New York. (20/20 SUMF ¶ 6).[1] As

---

[1] For the sake of completeness, the Court notes that Plaintiff transferred to Colorado Springs, Colorado and was promoted to General Manager in early 2008. (20/20 SUMF ¶ 10). Plaintiff then moved to between New York and California, and was ultimately transferred to Northern New Jersey in late 2008 or early 2009. (20/20 SUMF ¶ 14). At the start of his tenure at 20/20, Plaintiff sold Verizon products and, despite being taken off that account at various points, did so

of late 2008 or early 2009, he was based in Northern New Jersey. (20/20 SUMF ¶ 14).

Defendant Michael Fanelli was the Vice President of Sales responsible, in part, for overseeing the

area in which Plaintiff worked from about March 2009 forward. (20/20 SUMF ¶ 16).

Defendants 20/20 describe the two primary ways that Plaintiff sold Verizon products as

follows:

> (i) door-to-door, by sending sales people into the field (much like traveling
> salesmen) going to homes or garden apartments in an effort to induct residents to
> purchase Verizon's offerings; and (ii) through 'multi-unit events,' whereby
> Verizon assigns a large apartment building to 20/20, and 20/20 then stages an
> event in the building's lobby in an attempt to sign-up the building's residents to
> Verizon's services.

(20/20 SUMF ¶ 4).  For much of his employment, Plaintiff conducted sales by going door-to-

door. (20/20 SUMF ¶ 24).  However, by 2010, his business was comprised exclusively of multi-

unit events which were either assigned by his direct supervisor or through certain contacts at

Verizon that he had met through his employment. (20/20 SUMF ¶ 24; see also Verizon SUMF ¶

14).

Morin testified that he decided to leave 20/20 to work for Verizon directly and that

Defendant Brown of Verizon told him that his boss, Defendant Ottaviano, approved Plaintiff's

employment as an independent contractor. (20/20 SUMF ¶ 34).  Thereafter, on June 7, 2010,

Ottaviano attended a meeting at the 20/20 sales office. (20/20 SUMF ¶ 35).  Morin pulled

Ottaviano aside and thanked him for allowing Morin to become an independent agent and work

directly with Verizon. (20/20 SUMF ¶¶ 36-37; Verizon SUMF ¶ 53; Pl.'s SUMF ¶ 38a).

Ottaviano responded that he "didn't know what plaintiff was talking about." Id.

---

intermittently before his transfer to Northern New Jersey. (20/20 SUMF ¶¶ 9, 11, 13-14).
However, during the time in question he sold Verizon products. (20/20 SUMF ¶¶ 14).  In
addition, he was promoted from Account Executive to General Manager in 2008. (20/20 SUMF
¶¶ 6, 10).

As a result of that exchange, Defendant Ottaviano called Defendant Fanelli later that evening to inform him that Plaintiff approached Ottaviano about working directly for Verizon, which he deemed "inappropriate for an employee of 20/20." (20/20 SUMF ¶¶ 38-39). During that conversation, Ottaviano also told Fanelli about rumors of Plaintiff paying "kickbacks" to Verizon employees to obtain multi-unit events and that Verizon would investigate the situation. (20/20 SUMF ¶ 40; Verizon SUMF ¶¶ 56).

Upon hearing this information, Fanelli sent an email to 20/20 Human Resources the next day to report Plaintiff's attempt to work for Verizon as an independent agent. (20/20 SUMF ¶¶ 42, 44; Lee Certif. Ex. D). Notably, Fanelli did not mention the kickback rumor at this time and maintains that 20/20 did not act on those rumors. (20/20 SUMF ¶ 43; Lee Certif. Ex. D).

However, during a resulting interview with Fanelli and Plaintiff's direct manager, George Fallica, Plaintiff admitted to attempting to divert work. As a result, a written statement regarding what transpired was submitted to 20/20 Human Resources Specialist Linda Wilson. (20/20 SUMF ¶ 45-47). On the morning of June 9, 2010, Fanelli sent another email to Human Resources recounting the conversation at the interview and also relaying the following, in relevant part: "Anthony [Ottaviano] informed me that he felt Mark [Morin] was possibly giving out 'kickbacks' to VEC managers to obtain access to new properties/events etc. He said he had no data to back that up but that it is was [sic] 'a gut feeling.'" (Lee Certif. Ex. D).

On June 10, 2010, Fanelli sent Ottaviano an email to keep him apprised of the situation in which he wrote as follows:

> Anthony, I just wanted to give you a heads up, I am seeking termination for Mark Morin based on recent events. I have no data to back up any kickbacks or anything like that going on, however, I feel he is no longer a good fit for 20/20 or the Verizon campaign. I will let you know when he has been terminated. I'd like to recommend he is not allowed to sell on the FIOS campaign moving forward.

4

(20/20 SUMF ¶ 51).

On June 14, 2010, Fanelli sent an additional email to Ottaviano and other senior management at Verizon advising them of Morin's termination:

> Team, as of this morning Mark has been terminated from 20/20, Based [sic] on the lack of integrity and loyalty displayed, I feel he is no longer a good fit for us and should not be allowed to represent 20/20 Companies or Verizon in any capacity. Mark did a nice job for us in the past, however I feel he has things he needs to work on before being a suitable candidate for either of our companies.
>
> He told George this morning that he already has another position lined up and said "I'll be seeing you at the next VZ live event In [sic] Newark." I did not terminate Mark just so he could turn up with another vendor in the same market, especially before the 90 day period has past. I request that you keep an eye on that for me over the next 90 days and also recommend that he is not considered for reinstatement to the FIOS campaign at any time in the future as we are still investigating the relationships he had in the MDU/Event community.
> Our other top leaders are ready to step in for Mark to ensure we do not see a drop off in moral [sic] or productivity.
>
> Thanks and have a great week.

(20/20 SUMF ¶ 53). Despite Fanelli's request that Morin be prevented from reinstatement on any FIOS campaign in the future, the Verizon Defendants maintain that he was never placed on Verizon's "x-files list," which is "a list of agents who have, through their behaviors, acted in an inappropriate manner or a manner that Verizon deems inappropriate." (Verizon SUMF ¶¶ 93-95). Plaintiff submits, however, that he was told by at least one Verizon employee that Morin could no longer work with Verizon. (Pl.'s SUMF ¶¶ 33b-34b, 48a-b).

As noted above, separate and apart from the events relating to Morin's termination stemming from his attempt to work as an independent agent for Verizon, Ottaviano requested a Verizon investigation into the kickback rumors. Ottaviano testified that in so doing, his primary

concern was with the Verizon employees allegedly receiving the kickbacks, not Plaintiff. (Verizon SUMF ¶ 57). The investigation commenced in June 2010 and was completed in October of that year. (Verizon SUMF ¶¶ 58-59). It did not reveal any evidence of kickbacks. (Verizon SUMF ¶ 59).

On or about October 29, 2010, Plaintiff Morin filed the instant action in the New Jersey Superior Court of Hudson County. (CM/ECF No. 1). On December 13, 2010, Defendant removed this action on the basis of diversity jurisdiction. (CM/ECF No. 1). Plaintiff filed an amended complaint on June 21, 2011. (CM/ECF No. 18). That is the operative complaint now before the Court.

Both the Verizon and 20/20 Defendants filed their respective motions on May 25, 2012. The Verizon Defendants move for summary judgment as to Plaintiff's defamation claim (Count I) and the tortious interference claim directed at Verizon (Count III). (CM/ECF No. 37). Similarly, the 20/20 Defendants move for summary judgment as to Morin's defamation claim (Count I) and the tortious interference claim asserted against 20/20 (Count II). (CM/ECF No. 38).

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party must first demonstrate that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court construes facts and inferences in the light most favorable to the non-movant in order to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). An

6

issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). "Thus, if a reasonable fact finder could find in the nonmovant's favor, then summary judgment may not be granted." Norfolk Southern Ry. Co. v. Basell USA Inc., 512 F.3d 86, 91 (3d Cir. 2008).

### III.  DISCUSSION

Importantly, the parties do not dispute that the Morin was employed "at will" or that 20/20 had the right to fire Plaintiff. However, in opposition to the instant motions Morin submits that that "[e]ven if it be said that Mark Morin exhibited an excess of capitalist exuberance in seeking to advance himself as an independent agent to sell [FIOS] products for Verizon, it must also be recognized that Morin has never disputed 20/20's right to fire him, if the firing was actually based upon the alleged element of disloyalty, but not if based upon the defamation published by Ottaviano and/or Fanelli." (Pl.'s Opp'n., 5) (emphasis in original). He continues: "Whereas Ottaviano needlessly and heedlessly pinned the kickback label on Morin, Fanelli was willing and eager to spread the same words, unnecessarily and egregiously, and to follow up his actions with words seeking to *make sure* that Verizon, his client/customer, would not thereafter hire or utilize the services of Morin." Id. (emphasis in original).

As to an unrelated matter, the Court also notes at the outset that Plaintiff does not object to dismissal of any claims as to Verizon Defendant David Brown. (Pl.'s Opp'n., 11).

7

## A. Defamation

Plaintiff characterizes the facts in the Complaint as "primarily directed to the excessive methods, measures, and means that were taken by Verizon and 20/20 to destroy Morin's business reputation and in denying him a business opportunity to continue to work for 20/20, or to work for, or with, Verizon following his departure from 20/20." (Pl.'s Opp'n., 5). In addition, Plaintiff Morin emphasizes that other 20/20 employees left the company without incident. (Pl.'s Opp'n., 6). He argues that the difference in treatment compared to that of the other Verizon employee "demonstrates both a degree of malevolence against Morin by both Verizon and 20/20, and its principal performers Ottaviano and Fanelli, and also demonstrates the likely effect or contribution that the kickback defamation provided in motivating the actors from both Verizon and 20/20." (Pl.'s Opp'n., 7).

Under New Jersey law, "[i]n order to establish a prima facie case of defamation (whether denominated libel or slander), a plaintiff must show that defendant communicated to a third person a false statement about plaintiff that tended to harm [the] plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff" and that the plaintiff was harmed by the alleged defamation." W.J.A. v. D.A., 416 N.J.Super. 380, 384-85 (App. Div. 2010), aff'd 2012 WL 1820878 (N.J. May 16, 2010) (quoting McLaughlin v. Rosanio, 331 N.J. Super. 303, 313, 751 A.2d 1066 (App. Div. 2000)). Stated another way, establishing a defamation claim requires proof of the following elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence." Senisch v. Carlino, 423 N.J.Super. 269, 277 (App. Div. 2011) (quoting

DeAngelis v. Hill, 180 N.J. 1, 13 (N.J. 2004)); see also G.D. v. Kenny, 205 N.J. 275, 294 (N.J. 2011).  However, even if a statement is defamatory, truth is a full defense.  G.D. v. Kenny, 205 N.J. at 294 ("In a defamation action, truth is not only a common law defense, but also 'absolutely protected under the first Amendment.") (quoting Ward v. Zelikovsky, 136 N.J. 516, 528 (1994)).

New Jersey courts have long recognized a conditional special interest privilege which "arises out of a legitimate and reasonable need, in particular situations, for private people to be able freely to express private concerns to a limited and correlatively concerned audience, whether or not those concerns also touch upon the public interest in the broad sense." Bainhauer v. Manoukian, 215 N.J. Super 9, 36 (App. Div. 1987). Thus, a bona fide statement "in which the party communicating has an interest, or [is made] in reference to which he has a duty" is subject to qualified privilege "if made to a person having a corresponding interest or duty." Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 563 (1990) (quoting Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 149 A.3d 193 (1959)).  In such a case, a plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice. Erickson, 117 N.J. at 565; Senisch 423 N.J. Super at 279.

1. 20/20 Defendants

Defendant 20/20 advances the following arguments in support of its motion: (1) Plaintiff's claim does not contain the requisite level of particularity for defamation claims; (2) neither Fanelli nor 20/20 Communications ever made a defamatory statement of fact regarding Plaintiff which was false; (3) Fanelli and 20/20 are entitled to a qualified privilege; (4) Plaintiff cannot show actual malice; and (5) Plaintiff cannot show his reputation was damaged.

"As to defamation, the threshold inquiry is whether the challenged statement is susceptible of a defamatory meaning." Senisch, 423 N.J. Super. at 278. The Court assesses the fair and natural meaning of the statement as understood by a reasonable person of ordinary intelligence. G.D. v. Kenny, 205 N.J. at 293 (quoting Romaine v. Kallinger, 109 N.J. 282, 290 (1988)). However, in order to be defamatory, a statement must be capable of being proved true or false and, accordingly, statements of opinion are insufficient unless they imply false underlying objective facts. Lynch v. New Jersey Educ. Assoc., 161 N.J. 152, 167 (1999). The Court will address each clearly identified defamatory statement in turn. See Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 101 (App. Div. 1986), cert. denied, 107 N.J. 32 (1986); accord Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 767-68 (N.J. 1989).

The Court begins its analysis with the communication from Fanelli to Ottaviano. The only statement that was made outside 20/20 was in the June 10, 2010 email from Fanelli to Ottaviano. Fanelli wrote, in relevant part: "I have no data to back up any kickbacks or anything like that going on, however, I feel he is no longer a good fit for 20/20 or the Verizon campaign." (20/20 SUMF ¶ 51). A reasonable person of ordinary intelligence could not find the phrase relating to kickbacks capable of a defamatory meaning. As to the second phrase, in order to be defamatory, a statement must be capable of being proved true or false; mere opinion is

10

insufficient. <u>Lynch v. New Jersey Educ. Assoc.</u>, 161 N.J. 152, 167 (1999); <u>see</u> <u>Taylor v. Amcor</u>
<u>Flexibles, Inc.</u>, 669 F. Supp. 2d 501, 513 (D.N.J. 2009). To the extent that Fanelli was not
expressing his Opinion, the statement was true because Morin's termination was finalized within
days. <u>See</u> <u>Taylor</u>, 669 F. Supp. 2d at 513 ("A plaintiff cannot make a prima facie case of
defamation if the contested statement is essentially true"). Accordingly, the Court finds that the
communication from Ottaviano is incapable of defamatory meaning as a matter of law.

      With regard to the internal communications between the 20/20 Defendants, the first email
Fanelli sent to Human Resources following his conversation with Ottaviano did not mention the
kickback rumor; rather it dealt with Morin's attempt to divert business from 20/20 only. (20/20
SUMF ¶ 43; Lee Certif. Ex. D). However, once the inquiry into the diversion of business began,
Fanelli's email to Human Resources on June 9 did mention the rumor and provided, in relevant
part, as follows: "Anthony informed me that he felt Mark was possibly giving out 'kickbacks' to
VEC managers to obtain access to new properties/events etc. He said he had no data to back that
up but that it is was [sic] 'a gut feeling.'" (Lee Certif. Ex. D). Plaintiff argues that "the email of
6/9/10 to HR went far beyond the previous e-mail by reporting the allegations of kickbacks –
totally without substance or fact or investigation." (Pl.'s Opp'n., 10). However, the parties do
not dispute that it is true that Ottaviano informed Fanelli that he had a gut feeling that Morin was
giving out kickbacks.

      However, to the extent a reasonable person could understand the ordinary meaning of that
communication to be defamatory, the Court now turns to whether the conditional privilege
encompasses the internal communications by the 20/20 Defendants, as that dictates the requisite
burden of proof. As explained in <u>Bainhauer</u>,

> The critical test of the existence of the privilege is the circumstantial justification
> for the publication of the defamatory information. The critical elements of this

test are the appropriateness of the occasion on which the defamatory information is published, the legitimacy of the interest thereby sought to be protected or promoted, and the pertinence of the receipt of that information by the recipient.

215 N.J. at 36-37.  In other words, "[t]he test to determine whether a communication is entitled to the common interest privilege requires the Court to look to (1) the appropriateness of the occasion on which the defamatory information is published, (2) the legitimacy of the interest thereby sought to be protected or promoted, and (3) the pertinence of that information by the recipient." Prof'l. Recovery Servs. Inc. v. Gen. Elec. Capital Corp., 642 F. Supp. 2d 391, 401 (D.N.J. 2009).

The Court finds that the statements at issue fall within the scope of the privilege.[2]   In this case, Defendant Fanelli had a significant and obvious interest in whether an employee whom he oversaw was giving out kickbacks to obtain MDU events.  Not only would that impact Fanelli in his capacity as a supervisor, but it would also impact the integrity and reputation of the company as a whole.  In addition, Defendant Fanelli sent the information only to two individuals working in the human resources division of 20/20.  Aside from those references discussed above, Morin testified that he was unaware of any instances in which Fanelli repeated the kickback rumor and does not presently dispute that fact.  (20/20 SUMF ¶ 54; Pl.'s Response to 20/20 SUMF ¶ 54).  As explained above, the kickback allegations were part of the same conversation that gave rise to the human resources inquiry stemming from Plaintiff's attempt to divert 20/20 business.  Thus, the information was pertinent to human resources and the two specialists conducting the inquiry were appropriate recipients.

Accordingly, Plaintiff must prove by clear and convincing evidence that the 20/20 Defendants acted with actual malice.  Erickson, 117 N.J. at 565; Senisch 423 N.J. Super at 279.

---

[2] To the extent that Plaintiff argues that allegations of kickbacks constitutes slander per se, that question has no bearing on whether the statements at issue fall within the scope of the privilege. Bainhauer, 215 N.J. Super. at 39.

The standard is met where a plaintiff establishes that "the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." <u>Erickson</u>, 117 N.J. at 565. Plaintiff Morin does not argue that Defendant Fanelli knew this statement to be false. Rather, with regard to reckless disregard of the truth, Plaintiff argues that Fanelli failed to investigate before "publishing the defamatory material regarding Morin." (Pl.'s Opp'n., 37). On the other hand, the 20/20 Defendants argue that the statements upon which Plaintiff relies include references to the fact that there was no data or evidence backing up the rumor. (20/20 Defs.' Reply, 7). They continue: "If anything, this further illustrates Fanelli's attention to the truth and the absence of any disregard for the truth." As the plain meaning of the statement "he said he had no data to back that up" belies any interpretation to the contrary, the Court agrees.

Therefore, Plaintiff does not set forth a clearly defamatory statement that either of the 20/20 Defendants knew to be false. Notwithstanding, Plaintiff does not demonstrate actual malice by clear and convincing evidence. Therefore, the Court need not address the parties' remaining arguments as to this claim. Accordingly, summary judgment is granted in favor of the 20/20 Defendants as to Count I.

2. Verizon Defendants

The basis of Plaintiff's defamation claim as to the Verizon Defendants is the phone call in which Ottaviano informed Fanelli of the following: (1) the "inappropriate" conversation with Morin, which he termed inappropriate; and (2) the kickback rumor and that an investigation would ensue as a result. Specifically, as memorialized by Fanelli in an email to 20/20 Human Resources, Ottaviano communicated the following with regard to the kickback rumor, in relevant part: "Anthony informed me that he felt Mark was possibly giving out 'kickbacks' to VEC

managers to obtain access to new properties/events etc.  He said he had no data to back that up but that it is was [sic] 'a gut feeling.'" (Lee Certif. Ex. D).  Employing the analytical framework outlined above, the Court now turns to those communications.

First, as to whether the statement was defamatory, the Verizon Defendants argue that Ottaviano's statement was one of pure opinion "that was not treated by anyone as a factual allegation that Plaintiff had in fact been offering 'kickbacks.'" (Verizon Defs.' Br., 21).  They continue:

> throughout the entirety of discovery, Plaintiff has not produced any evidence whatsoever that there was a single person who was aware of the remark and too [sic] it seriously as a statement of fact.  To the contrary, every person who was aware of the statement, including Ottaviano, readily admitted that there was no factual basis to the statement.  In fact, Plaintiff himself admitted that he had no knowledge that Ottaviano ever told anyone that he, Ottaviano, was aware of facts or evidence that supported the rumors of "kickbacks."

(Verizon Defs.' Br., 21).

In opposition to the instant motion, Plaintiff argues that "not only did Ottaviano act with reckless disregard of the truth or falsity of the 'kickbacks' accusation, but in fact a subsequent investigation by Verizon established that there was a complete exoneration of the alleged recipients of the supposed kickbacks, meaning that the allegation against plaintiff was a lie, as established by clear and convincing evidence." (Pl.'s Opp'n., 37).  Although not entirely clear to the Court, Plaintiff appears to rest this argument on the fact that the investigation had not yet begun before Ottaviano informed Fanelli. (Pl.'s Opp'n., 37).  Notably, the fact that the investigation commenced shortly thereafter is not in dispute.

It is more relevant, however, that the parties do not dispute that an investigation was in fact conducted based on that rumor, that Verizon had the right to do so, or that Ottaviano maintained that he did not have any evidence of wrongdoing but only a gut feeling.  Nor do the

14

parties dispute that Morin did in fact approach Ottaviano to thank him and, accordingly, that portion of Ottaviano's statement to Fanelli was true.

In any event, to the extent that such a statement could be construed as defamatory, the Court finds that there was no actual malice on the part of Ottaviano. First, as delineated above, "[t]he test to determine whether a communication is entitled to the common interest privilege requires the Court to look to (1) the appropriateness of the occasion on which the defamatory information is published, (2) the legitimacy of the interest thereby sought to be protected or promoted, and (3) the pertinence of that information by the recipient." Prof'l. Recovery Servs. Inc. v. Gen. Elec. Capital Corp., 642 F. Supp. 2d 391, 401 (D.N.J. 2009). Plaintiff does not appear to contest that qualified privilege encompasses the communication from Ottaviano to Fanelli. Indeed, the Court finds that it applies here because of the following: (1) the ongoing business relationship between the parties which, in relevant part, consisted of 20/20 employees selling Verizon products; (2) the marketing agreement in place between 20/20 and Verizon which prohibited Verizon from hiring an employee of 20/20 for 90 days from the time employment concluded; (3) that Ottaviano only informed Fanelli; and (4) the fact that Verizon would begin an investigation regarding the rumor about a 20/20 employee bribing Verizon employees was very pertinent to 20/20. For largely the same reasons discussed above, the Court finds that Ottaviano did not act with reckless disregard for the truth; rather he emphasized that there was no evidence but that he would conduct an investigation.

Finally, to the extent that Plaintiff argues that Ottaviano's initiation of an internal investigation was defamatory (Pl.'s Opp'n., 29), Plaintiff does not specifically identify any statements in this regard. See Taylor v. Amcor Flexibles, Inc., 669 F. Supp. 2d at 513. In any event, Plaintiff does not argue that Ottaviano's initiation of the investigation or communication

with other Verizon employees would not fall within the scope of the qualified privilege or that his conduct constituted actual malice. Accordingly, the Court finds that there is no genuine dispute of material fact as to claims asserted against Verizon in Count I and grants summary judgment in favor of the Verizon Defendants.

## B. Tortious Interference

As an initial matter, in his Opposition, Plaintiff explains that "the communications between Ottaviano of Verizon and Fanelli of 20/20 each constituted the tort of tortious or intentional interference with the present and prospective economic relationships enjoyed by Morin (1) as a present employee of 20/20, and (2) with any opportunity Morin might have or would likely have been able to obtain working in [sic] behalf of Verizon." (Pl.'s Opp'n., 11). As to the former, Plaintiff clarifies: "Ottaviano interfered with [P]laintiff's employment relationship with 20/20 by making unfounded allegations of corruption by way of kickbacks, following which plaintiff was terminated by 20/20." (Pl.'s Opp'n., 27). Defendants argue, however, that Plaintiff may not maintain an action for tortious interference predicated upon the same conduct as his unviable defamation claim. (20/20 Defs.' Br., 28; Verizon Defs.' Br., 23-24). As the Court already dismissed the defamation cause of action as to all Defendants, Plaintiff may not maintain an action for tortious interference premised upon the same conduct. Prof. Recovery Servs., Inc. v. Gen. Elec. Capital Corp., 642 F. Supp. 2d 391, 408 (D.N.J. 2009) (citing Bainhauer, 520 A.2d at 1175)). Therefore, Count III of Plaintiffs Complaint for tortious interference directed at the Verizon Defendants is dismissed because it is premised upon the same conduct by Ottaviano as the defamation claim.

16

Accordingly, the Court confines its discussion to the portion of Plaintiff's claim premised upon the following: "Fanelli's subsequent conversation with Ottaviano to 'make sure' that Verizon did not utilize the services of Morin, even after the 90 day Verizon waiting period, was excessive, and a wrongful interference, where Fanelli clearly went out of his way to 'make sure' that Morin would not be given a work opportunity with Verizon." (Pl.'s Opp'n., 20).   Under New Jersey law, Plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious interference, and that it suffered losses thereby.  Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001). Thus, in order to state a claim for tortious interference with a prospective economic advantage or contractual relationship, a Plaintiff must plead the following elements: (1) the existence of a reasonable expectation of economic advantage; (2) Defendant interfered intentionally and with malice; (3) a causal connection between Defendant's interference and the loss of prospective gain; and (4) damage. Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-752, 563 A.3d 31 (1989); Espinosa v. County of Union, 212 Fed. Appx. 146, 157, 2007 WL 57178 (3d Cir.) cert. denied, 552 U.S. 822, 128 S.Ct. 144 (2007).

As discussed above, a number of agreements governed the relationships between the parties in this case.  The Employment Agreement referenced above provided, in relevant part, as follows:

5. RESTRICTIVE COVENANTS
A. Business Relationships and Goodwill   The employee acknowledges and agrees that as an employee and representative of the Company, the Employee will be responsible for building and maintaining business relationships and goodwill with current and future customers, clients, and prospects on a personal level . . . The Employee acknowledges and agrees that this responsibility creates a special relationship of trust and confidence between the Company, the Employee, and these persons or entities.  The Employee also acknowledges that this creates a high risk and opportunity for the Employee to misappropriate those relationships and the goodwill existing between the Company and such persons.

B. Consideration

(1)    Accordingly, the Employee specifically agrees that, during the period of time that Employee provides services for and on behalf of the Company during the "Restricted Period" (as defined below), the Employee shall not, either on his own or as a shareholder, principal, agent, consultant, manager, advisor, director, officer, control person, operator, or in any other capacity or manner whatsoever,

(a)    directly or indirectly engage in the same or substantially the same services that the Employee provides for the Company, either individually or on behalf of an entity or organization, in competition with the business of the Company, or its successors and assigns, which is located in, provides services in or does any business whatsoever in, the "Restricted Territory" (as defined below).

(b)    directly or indirectly divert away or attempt to divert away any business from the Company to another company, business, or individual.

(c)    directly or indirectly contact, solicit, attempt to solicit, seek to do business with, sell any product(s) or service(s) to, or attempt to sell any product(s) or service(s) to, whether initiated by Employee or the customer, any "Company Customer" (as defined below).

(20/20 SUMF ¶ 21). Also noted above, Defendant 20/20 additionally maintained an Employee Handbook which prohibited employees from diverting business from the company or soliciting customers for another company while employed and for two years thereafter. (20/20 SUMF ¶ 22). Finally, Defendants 20/20 and Verizon had a Marketing Agreement which provided, in relevant part, that during its term and ninety days thereafter, "Verizon shall not . . . hire an employee or agent who is either currently employed or was employed by [20/20] within ninety (90) days of being hired by Verizon." (20/20 SUMF ¶¶ 23, 28; Certification of Ex C.)

"New Jersey recognizes that the tortious interference with prospective economic benefit or advantage cause of action is separate and distinct from tortious interference with an existing contract." Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH, Civ. No. 10-453, 2010 WL 5239238 *at 4 (D.N.J. 2010);  see also Shalley v. Borough of Sea Bright, 2009 WL 1324024, * at 5 (N.J. Super. A.D.).  The primary difference between these two related torts

is the existence of a contract, rather than merely a reasonable expectation of an agreement. Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co., 912 F.Supp. 747, 772 (D.N.J. 1995).

The New Jersey Supreme Court explains that "it is 'fundamental' to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." Printing Mart, 116 N.J. at 752; Coast Cities, 912 F.Supp. at 772 ("[A]n action for tortious interference with a prospective contractual relation cannot be sustained 'where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship.'") (quoting Fregara v. Jet Aviation Business Jets, 764 F.Supp. 940, 955 (D.N.J. 1991)). The relevant relationship for purposes of Plaintiff's tortious interference claim against 20/20 is the prospective relationship between Morin and Verizon.

The 20/20 Defendants argue that "Plaintiff cannot prevail on his claim as to 'interference with economic advantage' for four reasons: (1) Plaintiff had no reasonable expectation of economic advantage; (2) 20/20 and Fanelli are not 'third-parties' against whom a tortious interference claim may be directed; (3) neither 20/20 nor Fanelli acted with malice and without justification or excuse and (4) the absence of a 'causal connection.'" (20/20 Defs.' Br. 30).

First, the Court finds that Plaintiff had no reasonable expectation of economic advantage. In order to establish this element, a plaintiff must "show that 'if there had been no interference, there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits.'" Printing Mart, 116 N.J. at 751. Defendant 20/20 urges that Plaintiff's expectation of economic advantage was not reasonable in light of the facts that Plaintiff was party to an Employment Agreement with 20/20 which unambiguously contained a restrictive covenant, and that he acknowledged receipt of the Employee Handbook which

19

prohibited him from attempting to directly service 20/20s clients.  (20/20 Defs.' Br., 31-32).

Thus, they argue that the obligations and limitations imposed upon Plaintiff preclude his

reasonable expectation.  (20/20 Defs.' Br., 32).  In addition, the Verizon and 20/20 Marketing

Agreement prohibited Verizon from hiring Plaintiff within 90 day of the conclusion of Plaintiff's

employment by 20/20.  Thus, the 20/20 Defendants argue that Verizon was  contractually

precluded from forging the type of relationship that Plaintiff sought.  (20/20 Defs.' Br., 32).

     Plaintiff does not argue that the applicable restrictive covenant is unenforceable.  Nor

does he clearly apply any case law to the facts of the case at bar in a manner which would

demonstrate that his expectation was reasonable.  Rather, Plaintiff writes:

> At bar, [D]efendant 20/20 has not attempted to enforce [the restricted covenant],
> and its apparent failure to enforce a presumed similar against [another former
> employee of 20/20 who allegedly left to work for a competitor] would certainly
> render any attempt to enforce it against plaintiff suspicious, and hypocritical, to
> say the least.  In addition, counter-claimant had offered no evidence of pecuniary
> damages.

(Pl.'s Opp'n., 24).  In this regard, Plaintiff appears to misconstrue Defendants' argument.  In

addition, it is unclear to the Court, however, how unsupported assertions of action or inaction

regarding another former employee's departure from the company is relevant to the case at bar.

In any event, as Defendant 20/20 urges, Plaintiff merely recounts his performance at 20/20 and

the fact that certain Verizon employees encouraged Plaintiff to pursue working directly with

Verizon.  In addition, Plaintiff does not coherently address the following: (1) the fact that when

Morin approached Ottaviano about employment at Verizon, Ottaviano told him that he had no

idea what he was talking about; or (2) the fact that Brown and Ottaviano testified that they

decided there was no need for Plaintiff at Verizon.  Accordingly, as Plaintiff establishes neither

that he had a reasonable expectation of economic advantage nor a genuine dispute of material

fact as to that issue, his claim must fail.  Therefore, the Court need not address the remaining elements and grants summary judgment in favor of Defendant 20/20

## IV. CONCLUSION

Accordingly, for the reasons set forth above, the Court grants both the 20/20 Defendants and Verizon Defendants' motions for summary judgment.  Accordingly, the Court dismisses Plaintiff's Complaint in its entirety.

An appropriate Order accompanies this Opinion.

Dated: September _5_, 2012

Jose L. Linares
United States District Judge